IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TANYA FRYE,

                        Plaintiff,

    v.

ANDREW SAUL, Commissioner of
Social Security,

                        Defendant.

OPINION AND ORDER

18-cv-550-wmc

This is an appeal from an adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g). Plaintiff Tanya Frye challenges the Commissioner's determination that she is ineligible for either disability insurance benefits or supplemental security income under Titles II or XVI of the Social Security Act, respectively. For the reasons set forth below, the court rejects these arguments and will affirm the Commissioner's decision.

FACTS[1]

## I. Background and Medical Evidence

### A. 2013-2015

Frye was born on April 3, 1984, making her 29 on her alleged onset date and 33 on the date of the ALJ's July 18, 2017, decision. Frye stopped working on October 2, 2013, due to shoulder and wrist pain associated with repetitive tasks performed while working as a punch press operator. While Frye's shoulder pain resolved with rest, her wrist pain

---

[1] These facts are drawn from the Administrative Record ("AR") (dkt. #6).

persisted. Eventually, Frye was diagnosed with tendinitis, a tendon tear, and cubital tunnel syndrome.

Although some of her symptoms improved, she continued to have elbow pain and tingling after conservative treatment efforts. On January 30, 2014, Dr. Kevin Rumball performed cubital tunnel release and tendon repair surgery on Frye's right wrist. On February 10, 2014, Frye was seen in follow up by Physician Assistant Mark Steging. Even though Steging encouraged her to do so, Frye was reluctant to move her right wrist and elbow. Steging then referred Frye to occupational therapy and encouraged her to use the arm for normal, everyday activities. (AR 430.)

At a follow up visit on March 5, however, Frye reported that she still had wrist and elbow pain and that she could not hold her phone for more than 2 minutes before her arm got heavy and dropped. On physical examination, Frye had good range of motion of the wrist and elbows, but moved both slowly and carefully. At the time, Steging indicated that Frye was recovering slowly with persistent pain, but could return to work with restrictions, including lifting no more than 2 pounds with the right arm, no repetitive use of the right arm, and other restrictions. (AR 431.)

At a follow-up visit on March 18, 2014, Dr. Rumball observed that, when he asked Frye to walk, she "continue[d] to hold her whole right upper extremity in a protected posture of shoulder abduction and elbow flexion." (AR 433.) Still, on examination, Dr. Rumball detected no weakness in her shoulder, elbow, or hand, and testing at the right elbow was negative. Rumball encouraged Frye to return to her prior activities, stating his belief that (1) she had reached the end of the healing process and (2) no permanent work

restrictions were warranted.  If she wished to return to work as a punch press operator, Dr. Rumball told Frye to pursue a work hardening program.[2]  Otherwise, Rumball advised her to begin looking for other types of work.  (AR 433.)

After Frye continued to complain of right forearm pain, numbness and tingling, for was referred to another physician assistant, Corinne Weis, in the Physical Medicine Department on May 30, 2014.  On examination, Weis noticed that Frye was exquisitely tender to palpation of the elbow and right forearm, but she had normal strength in the biceps, triceps, brachioradialis, and finger extension.  Although complaining of pain with full extension and full flexion, Frye was also able to flex and extend her elbow.  As a result, Weis had little to offer Frye in terms of additional treatment, but suggested medication changes and possibly an ultrasound-guided injection.  (AR 440.)  On July 16, 2014, Dr. Karie Zach affirmed PA Weis's assessment.  She recommended that Frye use her arm as much as possible and consider a work hardening program.  Dr. Zach then indicated that Frye should have a 10-pound lifting restriction and return to work on a gradual basis.  (AR 445.)

Frye then began seeing Steven Bowman, DO, an occupational health specialist at the Mayo Clinic, who wrote after examining Frye in October of 2014 that she was "fine," reporting a pain level of 2 and had "essentially a very normal examination."  (AR 472-73.)  However, when Frye saw Dr. Bowman some three months later, on January 9, 2015, she reported that her wrist hurt more, her function was not as good, and she was now asking

---

[2] A "work hardening" program is a functional restoration program specifically designed for injured workers to increase strength, endurance, and flexibility with the goal of returning to work.

for a disability rating and working with the Department of Vocational Rehabilitation, leading Dr. Bowman to question whether Frye was "at minimum accentuating her symptoms and potentially malingering" for secondary gain. (AR 472.) In response, Dr. Bowman wrote some short-term restrictions and suggested that Frye undergo a two-day functional capacity evaluation.

Consistent with that suggestion, Frye underwent a functional capacity evaluation on May 5 and 6, 2015. (AR 499-503.) Drawing directly from those findings, Dr. Bowman then completed a work release form on May 7, 2015, indicating that Frye could return to work with the following permanent restrictions:

- lifting 25 pounds occasionally, 15 pounds frequently;

- carrying on the right limited to 10 pounds frequently, 5 pounds continuously;

- horizontal reaching on the right limited to between occasionally and frequently;

- and avoid forceful pinch & grasp on the right with high frequency.

(AR 498.)

Some three months after that, on August 27, 2015, Frye saw Dr. Bowman again for a new complaint of upper back and right shoulder pain, which she attributed to her habit of cradling her right arm close to her body. (AR 541.) Noting that he had "constantly reminded" Frye *not* to cradle her arm in that position, Dr. Bowman did not detect any specific shoulder pathology and found that Frye had excellent pinch and grip strength and good biceps and triceps strength. Dr. Bowman did note that Frye had tender spots in and around her right scapular border, for which he advised she take over-the-counter anti-

inflammatories and follow up with a primary physician or chiropractor.

B. **2016-2017**

In February 2016, Frye began seeing Dr. Cheryl Bihn, a physiatrist, for her right-sided upper back and shoulder pain. An MRI of the cervical spine showed some moderate stenoses and small, left-sided disk protrusions, but no significant abnormalities that would explain her reported pain on the right side. (AR 546, 552.) Dr. Bihn then referred Frye to a physical therapist, but Frye stopped therapy after just five visits because she felt that her pain was not improving. In contrast, the physical therapist wrote that Frye had been responding quite well, improving her posture and range of motion and beginning to use her right arm for functional activities. (AR 547.)

Over the course of the next several months, Dr. Bihn continued to manage Frye's care, ordering an EMG of her right upper extremity, which showed no radiculopathy, and an MRI of her right shoulder, which likewise detected nothing abnormal. (AR 560, 567.) Nevertheless, Frye continued to complain of pain, even after undergoing medication changes, massage therapy, osteopathic manipulation therapy, facet injections, and trigger point injections. (AR 556, 559, 569, 578, 584.) By January 2017, Dr. Bihn had little left to offer Frye, other than recommending that she engage in aerobic activity, stop smoking (Frye smoked 1 pack of cigarettes a day), and perform stretching and strengthening exercises at home. Dr. Bihn also suggested acupuncture and a three-week pain clinic at Mayo-Rochester, although noting that many patients could not afford that pain clinic. (AR 585.)

In February 2017, Dr. Bihn referred Frye to occupational therapy. She was

scheduled for 11 sessions but was discharged after attending only six because she again felt that therapy was providing any benefit.  (AR 591.)

## II.  Administrative Proceedings

Frye first applied for disability insurance benefits on October 27, 2014, and for supplemental security income on February 9, 2015.  In both applications, she alleged a disability onset date of October 2, 2013.  After two agency denials, Frye's claim was appealed to Administrative Law Judge Deborah E. Ellis ("ALJ"), who held a hearing at which Frye and a vocational expert testified.  Frye was represented by counsel at the hearing.

Among other things, Frye testified that:  she lived in a mobile home with her 10-year-old daughter and her mother; she lost her job as a punch press operator because her employer could not accommodate her restrictions; and she had not looked for other work because the pain and stiffness in her neck made it difficult to do things.  Frye's daily activities consisted of:  taking care of her daughter; performing cleaning tasks such as mopping, sweeping, and dusting, with rest breaks; cooking light meals; sitting or lying down; using ice or heat on her neck; and taking naps.  According to Frye, her pain was so severe that it prevented her from getting out of bed a few times a week.  Frye also testified that she could not lift anything heavy with her right hand, and that driving and brushing her hair were difficult, although she had driven to the hearing.  Finally, she acknowledged taking walks and swimming with her daughter.

After reviewing Frye's past work (cashier, cook, hand packager, cleaner, and punch press operator), including the code number from the Dictionary of Occupational Titles that

would apply to each, the neutral vocational expert, John Riser, described the skill and physical exertion requirements of each job, both as Frye actually performed them and as specified in the DOT. (AR 63-64.) The ALJ then posed a hypothetical that asked whether a person of Frye's age and education who could perform light work, but only frequently operate hand controls with the right hand or reach to the side and front with the right arm, would be capable of performing Frye's past work. The VE responded that such an individual could perform Frye's past work as housekeeper, cook, and cashier. (AR 29-30.) However, he also testified that no jobs were available for someone who was off-task more than 15 percent of the day, or who was absent two or more days a month. (AR 66-67.)

On July 18, 2017, the ALJ issued a decision finding that Frye had severe impairments of degenerative disc disease, cubital tunnel syndrome, tendinitis, carpal tunnel syndrome, and a torn tendon of the wrist, but retained the residual functional capacity to perform light work, provided she was not required *more than frequently* (1) to operate hand controls with the right hand or (2) to reach to the side and front with her right upper extremity.[3] Based on the VE's testimony, the ALJ found that Frye's residual functional capacity did not preclude her from performing her past relevant work as a cook, cleaner, or cashier. Accordingly, the ALJ found Frye was not disabled under the Social

---

[3] Under the Social Security Administration's framework, activity that is done "frequently" is that which is done *up to* two-thirds of the workday, but not constantly. SSR 83-10, 1983 WL 312151, *6 (Jan. 1, 1983). Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b); 416.967(b).

Security Act.

The Appeals Council subsequently denied Frye's request for review, prompting her to seek judicial review under 42 U.S.C. § 405(g).


OPINION

On judicial review, the court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Frye contends that the ALJ: (1) failed to inquire and resolve conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles; (2) improperly determined that Frye's subjective complaints were not entirely credible; (3) failed to

properly evaluate medical opinions; and (4) "cherry-picked" the third party report from Frye's mother.   The court addresses each of these contentions in turn.

## I. VE Testimony

Plaintiff first argues the ALJ erred in failing to resolve what she characterizes as a conflict between the VE's testimony about jobs that could be performed by a person with her mild right hand and arm limitations and the description of those jobs as set out in the Dictionary of Occupational Titles ("DOT") and its companion publication, the Selective Characteristic of Occupations ("SCO").[4]  Under SSR 00–4p, the ALJ has an "affirmative responsibility" to ask the VE if his or her testimony conflicts with the DOT, and if there is an "apparent conflict," the ALJ must obtain "a reasonable explanation" for the conflict before relying on the VE evidence to support a decision about whether the claimant is disabled.   SSR 00–4p, 2000 WL 1898704, at *2-*3 (Dec. 4, 2000); *see also Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008); *Prochaska v. Barnhart*, 454 F.3d 731, 734-45 (7th Cir. 2006).  The ALJ must also explain in her decision how she resolved the conflict. *Id*. at *3.

Plaintiff is correct that the ALJ erred by failing to ask the VE if his testimony conflicted with the DOT.  As plaintiff concedes, however, this procedural error is harmless

---

[4] The DOT is a "Social Security Administration resource[ ] that list[s] occupations existing in the economy and explain[s] some of the physical and mental requirements of those occupations." *Pearson v. Colvin*, 810 F.3d 204, 205 n.1 (4th Cir. 2015). The Social Security Administration also uses a companion resource to the DOT – entitled, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993) -- that explains additional physical and environmental demands of the occupations listed in the DOT.

unless there actually was a conflict. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *see also Graves v. Colvin*, 837 F.3d 589, 593 (5th Cir. 2016) (ALJ's failure to make inquiry required by SSR 00-4p was harmless where plaintiff did "not even attempt to show that the vocational expert's testimony was actually inconsistent with the DOT"); *Poppa v. Astrue*, 569 F.3d 1167, 1174 (10th Cir. 2009) ("Because there were no conflicts between the VE's testimony and the DOT's job descriptions, the ALJ's error in not inquiring about potential conflicts was harmless."); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (ALJ's failure to ask VE about possible conflicts between his testimony and the DOT was harmless, since no such conflict appeared to exist); *Massachi v. Astrue*, 486 F.3d 1149, 1154 n. 9 (9th Cir. 2007)(failure to follow SSR 00–4p would have been harmless if there had been no conflict between opinion and Dictionary); *cf. Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Here, plaintiff identifies two, purported conflicts between the VE's testimony concerning the jobs she can do and the description of those jobs in the DOT/SCO: (1) no more than frequent use of hand controls with the right arm; and (2) frequent reaching to the side or in front with the right arm.[5] The jobs identified by the VE were cook (DOT 315.361-010), cleaner, housekeeping (DOT 323.687.014), and Cashier II (DOT 211.462-

---

[5] Plaintiff also asserts that the ALJ asked the VE a hypothetical that limited the individual to "occasional rotation, flexion and extension of the neck, occasional decision-making and low-stress." (Br. In Supp. (dkt. # 10) 7.) However, no such questioning appears in the transcript.

010).[6]  As plaintiff concedes, although the job descriptions contained in the DOT/SCO address the amount of reaching and handling required, they do not specify whether the jobs require *bilateral* reaching or handling, do not specifically address operation of hand controls, nor do they specify what direction (*i.e.,* overhead, in front, or to the side) of reaching is required.  Thus, there is no express conflict between the VE's testimony and the DOT/SCO.  Rather, the VE's testimony took up limitations simply not addressed by the DOT.

When a VE's testimony merely supplements (rather than conflicts with) the DOT, a plaintiff forfeits her opportunity to challenge the VE's testimony unless objected to contemporaneously at the administrative hearing itself.  *Brown v. Colvin*, 845 F. 3d 247, 254 (7th Cir. 2016) ("Brown concedes that [the VE's testimony about sit-stand options and allowable time off task] merely supplemented (and did not conflict with) the Dictionary of Occupational Titles (DOT), which means that she forfeited these arguments by failing to object to the testimony during the administrative hearing."); *see also Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (because DOT does not address the subject of sit-stand options, there was no apparent conflict between VE's testimony and the DOT).[7]  Because plaintiff's counsel failed to raise any objection at the hearing, she has

---

[6] The VE identified the DOT number for Casher II as 211.687-014, however, DOT Listing 211.687-014 does not exist.  Cashier II is listed as 211.462-010.

[7] During oral argument, plaintiff urged this court to follow *Sean M. M. v. Comm'r of Soc. Sec.*, No. 17-CV-964-CJP, 2018 WL 3656399, at *5-*6 (S.D. Ill. Aug. 2, 2018), where the court remanded the case because the VE had testified about topics not covered in the DOT, on the ground that it would be "obvious" to "an ALJ who routinely handles social security disability hearings . . . that [the DOT's job] descriptions do not cover the areas noted by plaintiff."  Id. at *5-*6.  Because *Sean M.M.* does not comport with the law of the Seventh Circuit as expressed in *Brown* and *Zblewski*, the court declines to do so.  Moreover, for the reasons set forth above, plaintiff would lose even if that

forfeited this challenge.

Even if not forfeited, plaintiff loses on the merits of this challenge. Specifically, plaintiff makes no showing that the jobs identified by the VE – cashier, cook, and housekeeper—imposed reaching or handling requirements greater than that specified by the ALJ in her hypothetical. In fact, according to the job descriptions in the SCO, all of the jobs require the ability to reach and handle frequently, which plaintiff can do with both hands and arms and in any direction. She is restricted only from *constantly* operating hand controls with the right hand or reaching to the side or front with that arm. Nothing in the DOT/SCO's job descriptions requires the performance of such tasks. Accordingly, because plaintiff has failed to show an actual conflict between the VE's opinion and the DOT/SCO, the ALJ's procedural error was harmless and does not warrant a remand.

## II. Frye's Subjective Complaints

Plaintiff next argues that the ALJ improperly discounted her subjective complaints. Specifically, plaintiff testified that she needs to take frequent breaks throughout the day due to pain. The court reviews an ALJ's credibility findings deferentially, reversing only if it is "patently wrong." *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017).

In evaluating the credibility of a claimant's statements regarding her symptoms in particular, the ALJ must initially determine whether the claimant suffers from a medically

---

exception were followed here.

determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 WL 1119029, *3. If so, the ALJ must then evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.*, 2016 WL 1119029, *4. If not substantiated by objective medical evidence, however, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record while considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment that the claimant has received for relief of pain or other symptoms. *Id.*, 2016 WL 1119029, *7.

Here, the ALJ concluded that while plaintiff's medical impairments could reasonably be expected to cause her reported symptoms, plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical and other evidence in the record. (AR 25.) Moreover, while the ALJ did not tease out each of plaintiff's alleged symptoms or limitations, she did provide the following global rationale for discounting them:

> In terms of the claimant's alleged neck and arm pain, she never appeared to be in any acute distress during her examinations. Further, while the claimant reported that she has difficulty getting dressed, driving, and taking care of her hair, she still manages to take care of her 11-year-old daughter, do house chores, drive, grocery shop, play cards socially and swim. Further, the claimant was referred to therapy on numerous occasions and has stopped attending against her doctor's orders because she believed her pain was not improving. Treatment notes indicate that the claimant benefited from therapy and the claimant had increased range of motion in her right arm. Based on the record, the claimant is able to perform light work with additional limitations pertaining to the right upper extremity to accommodate the claimant's likeliness to

13

suffer a flare-up of her pain symptoms.

(AR 26) (record citations omitted).

Nevertheless, plaintiff argues that this credibility assessment was flawed in two respects: (1) the ALJ's assessment of plaintiff's daily activities failed to account for plaintiff's testimony that these activities were punctuated by periods of rest; and (2) the ALJ did not properly consider the medical evidence from 2016-17, which "seemed to revolve around the issue of chronic pain and/or somatoform disorder." (Br. in Supp. (dkt. #10) 19-20.) The court disagrees as to both.

An ALJ may consider a claimant's daily activities when evaluating her subjective symptoms. SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016); *see also Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (stating "[a]n ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."). The ALJ properly considered plaintiff's description of her daily activities in assessing whether her testimony about the effects of her arm and neck pain were credible or exaggerated. Although the ALJ could have more specifically explained how plaintiff's daily activities were inconsistent with her subjective complaints, plaintiff's daily activities, which include driving, cooking small meals, and household chores such as laundry and sweeping, can be fairly construed as inconsistent with her claim of a disabling right-hand impairment. *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) (holding that "the ALJ could have been more specific as to which physical and mental impairments and symptoms he thought were exaggerated . . .

[but] [t]he ALJ's explanation was sufficient to reasonably conclude that Pepper exaggerated the effects of her impairments.").

Most importantly, as the Commissioner points out, the ALJ did not rely solely on evidence of plaintiff's daily activities in discounting her subjective complaints. The ALJ also noted on the objective medical evidence, including physical examinations and imaging of plaintiff's wrist and shoulder that noted only minor abnormalities, as well as examination notes documenting that plaintiff was in no acute distress and had few, functional limitations. Although an ALJ may not discredit a claimant's testimony *solely* because of a lack of objective medical support, the ALJ may -- indeed, *must* -- consider the objective medical evidence as part of her analysis. *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) ("[T]he lack of objective support from physical examinations and test results is still relevant even if an ALJ may not base a decision solely on the lack of objective corroboration of complaints of pain"); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (noting that "discrepancies between objective evidence and self-reports may suggest symptom exaggeration"). The Commissioner's regulation concerning subjective complaints directs ALJs to look to the objective medical evidence for corroboration, explaining that "[e]xamples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain." SSR 16-3p.

Moreover, as noted, not just the ALJ, but plaintiff's own treating physicians, including Dr. Bowman, questioned whether she was "at minimum accentuating her symptoms and potentially malingering." Presumably, this is why plaintiff ultimately

appears to concede that the objective medical findings failed to corroborate the severity of her pain complaints, and instead asserts that she has a somatoform disorder (a form of mental illness that causes one or more bodily symptoms, including pain, which may or may not be traceable to a physical cause), then criticizes the ALJ for not properly considering that diagnosis. (Br. in Supp. (dkt. # 10) 24-25). However, plaintiff was *never* diagnosed with a somatoform disorder, nor did any of her doctors refer her to a psychologist or psychiatrist. Thus, her claim that a "diagnosis of somatoform disorder exists" (and therefore the ALJ ought to have given more credence to her pain complaints) is wholly unsupported by the record.

The ALJ acknowledged that plaintiff sought treatment for pain on multiple occasions in 2016-17, and she discussed plaintiff's subjective allegations of pain in the decision. (AR 24 ("The claimant continued to present with neck pain, right shoulder pain, arm pain and numbness in her right hand from April to November 2016.")); (AR 25-26 (discussing plaintiff's testimony about her pain)). As the ALJ correctly noted, however, physical examination findings and various diagnostic studies during this period were largely normal and inconsistent with the disabling levels of pain of which plaintiff complained.

Plaintiff further accuses the ALJ of improperly "playing doctor" with respect to this evidence, arguing that the ALJ lacked the expertise to interpret MRI or EMG studies. *See McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (ALJ erred in interpreting MRI results without medical input); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (ALJ erred in accepting a state agency physician's opinion where physician did not have access to later medical evidence containing "significant, new, and potentially decisive findings,"

including new MRI report, that could "reasonably change the reviewing physician's opinion"); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (same). As the Commissioner correctly notes, however, the ALJ did *not* interpret raw images or test data on her own, but rather accurately recited the findings as reported to or by plaintiff's treating physicians. *Accord Schuelke v. Saul*, No. 18-CV-833-JDP, 2019 WL 2514825, at *2 (W.D. Wis. June 18, 2019) (declining to remand for expert consideration of EMG and MRI evidence where "the ALJ's record citations show that he was relying on opinions from Schuelke's treating physicians, who analyzed these scans and test results. He was not looking at the raw images and test results and analyzing them himself."). In fact, although plaintiff cites four paragraphs from the ALJ's decision that she claims proves that the ALJ "played doctor," she fails to identify which of the ALJ's various statements supposedly crossed that line. (Br. in Supp. (dkt. # 10) 22-23.) By offering only a skeletal argument, therefore, plaintiff has also waived this objection. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Finally, plaintiff raises no valid objection to the ALJ's consideration of her failure to follow through with physical therapy in early 2016 and occupational therapy in early 2017 as a reason to discount plaintiff's credibility. "[I]nfrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (citing Social Security Ruling 96–7p). And although plaintiff testified at the hearing that she stopped going to therapy because it wasn't helping (AR 54), the ALJ was not obligated to credit this testimony, especially where at least one of

plaintiff's own physical therapists wrote a medical note indicating that, in fact, plaintiff *was* benefitting from therapy. Although not overwhelming evidence of symptom exaggeration, it was reasonable for the ALJ to question why plaintiff would have self-terminated her therapy if really as limited as she reported.

In sum, along with plaintiff's treating physicians' own questioning of her malingering, the ALJ properly considered plaintiff's daily activities, the lack of objective medical support, and plaintiff's failure to follow prescribed treatment as reasons to find that plaintiff's subjective pain complaints were not entirely credible. Moreover, as discussed in the next section, the medical opinions in the record also failed to support plaintiff's allegations of disabling limitations. At minimum, the court finds that the ALJ's credibility finding was not "patently wrong."

## III. Medical Opinion Evidence

In reaching her conclusions about plaintiff's residual functional capacity, the ALJ explained that she gave great weight to the opinions of Dr. Bowman, Dr. Rumball, and the state agency disability examiners, all of whom concluded that plaintiff could use the right arm with some limitations. Plaintiff argues that the state agency physicians' opinions were "outdated" because they did not account for the later evidence showing that plaintiff had "chronic pain and/or a somatoform disorder." (Br. in Supp. (dkt. #10) 21) (citing *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018)). As noted previously, however, plaintiff was not diagnosed with a somatoform disorder.

As for the records documenting plaintiff's reports of continuing right-sided neck, back, and arm pain, plaintiff does not point to any evidence of a new diagnoses, physical

findings documenting limitations more restrictive than the agency doctors found, or any new medical opinions supporting her claim. Indeed, the cited records consist mostly of plaintiff's subjective complaints, which the ALJ reasonably found were not entirely credible. Moreover, contrary to plaintiff's suggestion, an ALJ is not required to consult a medical expert about every new piece of medical evidence submitted by the claimant. Generally, claimants continue to receive treatment up to and even after the date of the administrative hearing, which occurs long after the state agency physicians reach their opinions. "If an ALJ were required to update the record any time a claimant continued to receive medical treatment, a case might never end." *Keys v. Berryhill*, 679 F. App'x 477, 480–81 (7th Cir. 2017) (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)). Only where the plaintiff presents "later evidence containing new, significant medical diagnoses [that] reasonably could have changed the reviewing physician's opinion," should the ALJ decline to rely on the reviewing physician's earlier opinion. *Moreno*, 882 F.3d at 728.

Here, plaintiff fails to offer any persuasive argument why, in the absence of a new diagnoses or significant medical findings, medical records showing continued subjective complaints of pain would be reasonably likely to change the state agency physicians' opinions. Accordingly, the ALJ did not err in relying on those opinions. *See Olsen v. Colvin*, 551 F. App'x 868, 874–75 (7th Cir. 2014) (finding that ALJ did not "play doctor" when she summarized the results of each of claimant's MRIs and concluded from those tests that claimant's abnormalities were mostly mild); *Keys*, 679 F. App'x at 480–81 (finding no error

when ALJ did not send updated records to the consulting physicians because claimant failed to "explain how the findings on those reports undermine" their opinions).

Even if the ALJ did err by not asking agency physicians to update their opinions, she had a right to rely on the opinions of plaintiff's own treating physicians, Dr. Bowman and Dr. Rumball. Dr. Rumball declined to offer specific restrictions in plaintiff's use of her right arm, permitting her to use it "as tolerated"; and Dr. Bowman endorsed limitations quite consistent with those found by the ALJ. Plaintiff does not (1) raise any challenge to the ALJ's reliance on these opinions, (20 argue that there were more restrictive opinions deserving of greater weight, or (3) otherwise object to the ALJ's RFC assessment. Accordingly, because there were medical opinions in the record that supported the ALJ's RFC assessment, including both treating physicians' opinions, any error in the ALJ's reliance on the state agency physicians' opinions was harmless.

## IV. Third Party Function Report

Finally, under the Commissioner's regulations, ALJs *may* consider evidence from non-medical sources about the applicant's disability claim. 20 C.F.R. §§ 404.1513(4); 416.913(4). In her decision, the ALJ stated that she gave "great weight" to a Third Party Function Report completed by plaintiff's mother, Rose Frye. (AR 28.)

Rose Frye wrote that she spends about 6-8 hours a week with her daughter, and according to her, plaintiff had very limited use of her right hand and arm, had trouble lifting and reaching, and took breaks when doing her daughter's hair or household chores. However, Rose Fyre also reported that plaintiff was able to cook small meals, grocery shop

for an hour, drive a car, vacuum twice a week, do laundry (but no folding), follow instructions well, and finish what she started. (AR 287-94.) Thus, Frye's report largely was the same as plaintiff's testimony.

As plaintiff did with her own testimony concerning her daily activities, therefore, plaintiff argues instead that the ALJ presented a one-sided view of Frye's report, which inaccurately reflects plaintiff's limitations. In particular, argues plaintiff, the ALJ ignored Rose Frye's testimony that plaintiff needed to take breaks while doing household chores or her daughter's hair. (Br. in Supp. (dkt. #10) 12.) Where third party testimony is "essentially redundant" of the plaintiff's testimony, however, the ALJ does not err in failing to address the third party testimony, since the analysis would be duplicative of the ALJ's analysis of the plaintiff's complaints. *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

Here, it is reasonable to assume the ALJ rejected Frye's testimony about plaintiff's need for breaks for the same reason that she found plaintiff's subjective complaints not entirely credible -- namely, their inconsistency with the objective medical evidence, treating medical opinions of malingering, and plaintiff's failure to follow through with prescribed therapy. As discussed previously, those reasons pass muster under the deferential review standard. Accordingly, it follows that remand is not necessary for reconsideration of Rose Frye's redundant report.

ORDER

IT IS ORDERED that:

The decision of the Commissioner of Social Security denying plaintiff Tara Frye's applications for Disability Insurance Benefits and Supplemental Security Income is AFFIRMED. The clerk of court is directed to enter judgment for the defendant and close this case.

Entered this 17th day of January, 2020.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge